UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
UNITED STATES OF AMERICA,

                                  **MEMORANDUM AND ORDER**

     -against-

                                  08-CR-428 (KAM)

RUPINDER KAUR
----------------------------------X

KIYO A. MATSUMOTO, United States District Judge:

        Defendant Rupinder Kaur, a United States Postal Service (Postal Service) employee, is charged in a two-count Indictment with embezzlement of at least $1,000 from a Postal Service Point-of-Service cash drawer, and with falsifying records of transactions in the Postal Service Point-of-Sale computer system, in violation of 18 U.S.C. §§ 1711 and 2073. She has moved to suppress certain statements she made on March 21, 2008 to two agents from the Postal Service's Office of the Inspector General during an interview in the basement of the Postal Service's Linden Hall Station in Flushing, New York, where she worked. The court grants the defendant's motion for the reasons that follow.

                          **I.    BACKGROUND**

        The facts relevant to this motion, as set forth in the motion papers, exhibits, and testimony at the hearing, are as follows. The defendant worked as a window clerk at the Linden Hill Station beginning in February 2000. The defendant is unfamiliar with the criminal justice system beyond a single arrest for petit larceny, for which she pleaded guilty to a

noncriminal violation. When defendant reported for work on the morning of March 21, 2008, her supervisor directed her to the basement, where she met Special Agents Anthony Chironno and Patrick Casey from the Postal Service Office of the Inspector General. The agents told the defendant that they were there to interview her. She asked the purpose of the interview, but before informing defendant of the purpose of the interview, the agents handed her a document entitled "Garrity Warnings: Acknowledgment of Rights." Special Agent Chironno testified that he is required to give the Garrity warnings whenever he conducts an interview. Special Agent Chironno then directed the defendant to read the document, which states, in relevant part:

1. I have the right to remain silent if my answers may result in a criminal charge being brought against me.

2. Anything I say or do may be used as evidence in administrative proceedings, civil proceedings, or any future criminal proceeding involving me.

3. If I refuse to answer the questions posed to me on the grounds that the answers may tend to incriminate me, I cannot be discharged solely for remaining silent.

4. This interview is strictly voluntary and I may leave at any time.

(Defendant's Memorandum (Def. Mem.), Exhibit B.) The agent also verbally informed the defendant of these rights, and she verbally acknowledged that she understood. Special Agent Chironno testified credibly that after reading the first Garrity warning,

he added a comment that he makes as part of his usual "schtick" whenever he gives Garrity warnings, to the effect that "if you killed JFK years ago, don't tell me." He testified that he also added a comment to the effect that "if you didn't do anything wrong, you would know that it doesn't apply."

After reading the Garrity warnings, according to the defendant's affidavit, the defendant told Special Agent Chironno that she was a divorced mother of two and offered to cooperate if he promised that she could keep her job.[1] Special Agent Chironno testified that he responded that he could not make such a promise because he lacked the authority, and that the defendant then started to cry. Special Agent Chironno testified that after the Garrity warnings were provided, the defendant asked to contact her union representative, and then offered to cooperate if the agent promised that she could keep her job. The court finds that this minor discrepancy in the sequence of events is immaterial.

The central factual issue between the parties is whether Special Agent Chironno made the following statements after the defendant asked for her union representative. The defendant claims in her affidavit that Special Agent Chironno told her that she could contact her union representative, but "he told me that the union representative 'won't do anything' and the union representative 'would tell me to keep my mouth shut, which

---

[1] As set forth herein, the defendant has withdrawn from her motion to suppress this statement.

won't help anything,' and that 'I was smart enough to make my own decisions.'" Def. Aff. ¶ 9.

Special Agent Chironno denied at the hearing that he made these statements, but admitted that, in an attempt to clarify the role of the union steward, he told the defendant that the union representative could not answer questions for her, and that her union representative's role was to ensure that her union rights were protected, and that she would have to answer the questions herself. Special Agent Chironno specifically denied making any predictions about what the union representative would do. As to the agent's alleged comment, "you are smart enough to make your own decisions," Special Agent Chironno testified on direct and on cross-examination that he tells all interviewees, as part of his "schtick" about JFK, as described above, that they know if they did anything criminal and that the warnings may or may not apply, depending on the circumstances. The court finds that Special Agent Chironno's testimony regarding what he said and did not say to the defendant is credible.

After this, the defendant and her station manager attempted to contact her union representative by telephone. During this time, defendant got up and walked around in the basement, making calls, and waited with the agents in the basement for approximately one hour for her union representative to arrive. Before the union representative arrived, but after the defendant received the Garrity warnings, Special Agent

Chironno informed the defendant that the purpose of the interview was to investigate whether she took money from the Point-of-Sale cash drawer, and to investigate another employee for making a false Point-of-Sale transaction.

The union steward arrived after approximately one hour, at which time the agents requested that the defendant again read and review the Garrity warnings in the presence of her union representative. Special Agent Chironno again read the Garrity warnings, with the same "schtick" about JFK, and again defendant verbalized her understanding of the warnings. Although the defendant verbally acknowledged that she understood her Garrity rights each time she read them, she never signed either of the two Garrity waiver forms.

Responding to questions from the agents with her union representative present, the defendant told the agents that she was unaware of false Point-of-Sale transactions by co-workers and did not want to be involved in her co-workers' matters. The defendant responded to the agents' questions about floor stock shortages by stating that her supervisor never informed her or anyone else of stock shortages, and she was otherwise unaware of stock shortages. The defendant denied ever stealing any postal funds from her cash drawer or from the Postal Service.

The defendant's motion papers did not mention that the agents reviewed video clips from covert surveillance with her, which allegedly show her falsifying Point-of-Sale entries. The

government's motion papers and Special Agent Chironno's testimony, however, establish that defendant was shown surveillance video clips during the interview. Special Agent Chironno testified that the defendant denied any wrongdoing, explaining, in response to the video clips, that she must have input any unrecorded sales shown on the video clips into the Point-of-Sale system at a later time. Special Agent Chironno also testified that he offered the defendant an opportunity to provide a sworn, written statement, which she declined. The court credits this testimony.

## II. DISCUSSION

The court first notes that at a status conference on December 3, 2008, the defendant withdrew from her motion to suppress, her offer to cooperate with the agents if they would let her keep her job, and the court accepted her withdrawal of this statement from her motion to suppress. Defendant's motion, therefore, seeks only to suppress her subsequent statements, made in the presence of her union representative and after she received the second Garrity warnings, that she did not know about, and did not wish to be involved in, matters regarding her co-worker; that she had no knowledge of floor stock shortages or false Point-of-Sale transactions; and that she had never stolen postal funds from her cash drawer or from the Postal Service.

At the hearing, the court received testimony from Special Agent Chironno. The court finds the testimony of Special

6

Agent Chironno credible.

The defendant's motion relies on the claim that, under the totality of the circumstances, the statements by Special Agent Chironno to the defendant were coercive and overbore the defendant's will, making her statements after the second Garrity warnings involuntary and thus inadmissible. Given that the court fully credits Special Agent Chironno's testimony, the court finds that under the totality of the circumstances, the defendant's statements were not voluntary.

The defendant admits, in footnote one on page three of her reply memorandum (Def. Rep. Mem.), that she was not in custody during her interview.[2] In a noncustodial setting, the voluntariness of a defendant's statements depends on "whether the accused was deprived of his free choice to admit, to deny, or to refuse to answer." Garrity v. New Jersey, 385 U.S. 493, 496 (1967) (internal quotations and citations omitted); see also United States v. Mast, 735 F.2d 745, 749 (2d Cir. 1984). In considering this question, the court must consider whether, under the totality of the circumstances, the defendant's free will was overborne by the conduct of law enforcement officials during the interview. Schneckloth v. Bustamante, 412 U.S. 218, 226 (1973); Mast, 735 F.2d at 749. The circumstances to be considered

---

[2] Although the defendant asserts that she was not advised of her right to counsel, the agents were not required to do so because the defendant was not in custody. See United States v. Kirsh, 54 F.3d 1062, 1067 (2d Cir. 1995) (stating that "Miranda warnings are not required unless law enforcement agents interrogate a person who is in custody.").

7

include "the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991) (citing Schneckloth).

First, as to the defendant's characteristics, the defendant claims that she is an unsophisticated person who lacks significant experience with the criminal justice system and was unaware of her rights. The record establishes that the defendant appeared to have no difficulty speaking or understanding English, and that she understood the Garrity warnings both times the agents requested that she read and review them. Those warnings advised the defendant that she had the right to remain silent if her answers might result in criminal charges, that she could not be discharged for refusing to incriminate herself, that the interview was voluntary, and that she was free to leave at any time. Given that the defendant was able to understand these rights, the court finds that defendant's characteristics do not bear significant weight in the court's determination.

Second, the conditions of the defendant's interview do not support a finding of coercion. The defendant's memorandum contends that she was "isolated" in the basement of her workplace and "alone" with the agents when she made her statement. The defendant, however, has withdrawn her motion to suppress her statement made prior to the arrival of the union representative. The evidence establishes, however, that although the statements

of the defendant that are at issue here were made in the basement, they were made when she was in the presence of her union representative and the agents. The defendant chose to remain in the basement with the agents and await her union representative's arrival, despite being advised that she was free to leave and that the interview was voluntary. Special Agent Chironno credibly testified that he emphasized that defendant was free to leave at any time, and that during that time, defendant attempted to reach her union representative and was not interviewed. Only after her union representative arrived, and defendant again indicated her understanding of her Garrity rights, after being requested to read and review the Garrity warnings a second time in the presence of the union steward, did the agents interview the defendant. Defendant was not alone with the agents in the basement when she made her statements.

Although a basement could be an isolated location, the agents diminished the potential for isolation by waiting until the defendant had a representative at her side when they reissued the Garrity warnings and interviewed her. The defendant does not specify any characteristics of the basement that would make it a negative or coercive environment, and at the time of the interview she had worked in the building for many years. Special Agent Chironno's description of the basement area does not suggest a coercive environment and he credibly testified that the basement location was selected to provide defendant with privacy

9

during the interview. The court therefore finds that the conditions of the interview were not coercive in these circumstances.

Finally, the court finds that the evidence supports a finding that the conduct of the agent, specifically his comments regarding the Garrity warnings, were confusing and undercut the specific rights provided in the Garrity warnings. By suggesting that the right to remain silent applied if defendant committed a criminal act, when he said words to the effect, "if you didn't do anything criminal, you would know this doesn't apply," the agent conveyed that invoking the right to remain silent would indicate a consciousness of guilt. Further, by telling the defendant that the union representative could not answer questions for her, and that she would "have to answer the questions herself," the Garrity right to remain silent was further undermined.

In Anderson, an agent properly apprised an arrested defendant of his Miranda right to remain silent, but then falsely told the defendant that he would never be able to cooperate if he invoked his right to an attorney and pressed the defendant to make an immediate statement. 929 F.2d at 99-100. Unlike in Anderson, defendant had not been arrested and was not in custody. However, as in Anderson, Special Agent Chironno's comments gave incorrect legal advice by suggesting that the Garrity warnings may or may not apply, depending on whether defendant knew she was guilty, and that defendant, not her union

representative, would have to answer questions. The agent's comments conveyed that only if the defendant committed a crime should she remain silent, thus implying that invocation of the right suggested that she was guilty, and further that even though defendant had been advised of her right to remain silent, she would have to answer questions because her representative could not answer for her.

Despite the fact that the Garrity warnings were administered again in the presence of defendant's union representative, the agent again gave the same "schtick" about the Garrity rights applying if the defendant did something wrong. The defendant's understanding of her Garrity rights, which included the right to remain silent, to leave, and to decline to be interviewed, were undercut by the agent's comments. Thus, the court finds that defendant's free will was overborne by the agent's comments.

Under the totality of the circumstances, therefore, the court finds that the defendant's statements were not voluntary and free of coercion. Accordingly, the defendant's motion to suppress her statements, made in the presence of her union representative, is granted.

**SO ORDERED**

Dated:   Brooklyn, New York
         December 8, 2008

/s/
**KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York