UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

UNITED STATES OF AMERICA

     -against-

RUPINDER KAUR,

                             Defendant.

-----------------------------------------------------------------------X

**MEMORANDUM
AND ORDER**
08-CR-428 (KAM)

A P P E A R A N C E S :

Benton J. Campbell
United States Attorney, Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
        Attorney for the Government
        *By  Karin Klapper Orenstein, Esq.*

Bajaj & Associates, PLLC
1170 Broadway, Suite 1206
New York, New York 10001
        Attorneys for Defendant
        *By Bruno Charles Bier, Esq.*

**KIYO A. MATSUMOTO, UNITED STATES DISTRICT JUDGE:**

        Defendant Rupinder Kaur, a former window clerk for the United States Postal

Service (Postal Service), was convicted on December 15, 2008 after a jury trial of one count of

embezzlement by failing to account for or turn over more than $1,000 in postal funds which

came under her control in the course of her duties, in violation of 18 U.S.C. § 1711, and one

count of making false entries in postal records she was obligated to maintain, in violation of 18

U.S.C. § 2073.  Defendant now moves for a new trial pursuant to Fed. R. Crim P. 33, or, in the

alternative, a judgment of acquittal pursuant to Fed. R. Crim P. 29, based on her claim that the

government violated Fed. R. Crim. P. 16(a)(1)(E) by failing timely to disclose a June 2, 2006

video clip which the government never introduced into evidence, but about which the

government elicited testimony from the case agent on redirect examination.  For reasons

provided in full below, the motion is denied.

## I.  BACKGROUND

**A.** **Pretrial Disclosures of Video Surveillance Recordings**

Between April and September 2006, the Postal Service Office of the Inspector

General investigated losses occurring at the Linden Hill Station of the Flushing, Queens Post

Office.  During this period, Special Agent Anthony Chironno collected, via a hidden video

camera, approximately 800-1,000 hours of digitally-recorded video surveillance of the defendant

at her work station, which also included defendant's entries in her work station computerized

register.

The defendant was indicted on June 26, 2008 on charges of violating 18 U.S.C.

§§ 1711 and 2073.  A superseding indictment charging the same violations (but adding an

alternative basis for the violation of 18 U.S.C. § 1711 charged in Count One) was filed on

November 19, 2008.  By letter dated August 8, 2008, the government, *inter alia*, memorialized

that on July 28, 2008, the government provided defense counsel with a DVD containing covert

surveillance video, along with an activity log summarizing the contents of the video on the DVD

and an "Accountability Examination Record."[1]  (Doc. No. 74, Def. Mem. at 3, Ex. A at 2.)  It is

undisputed that by September 26, 2008, the government had offered to provide a complete copy

of the four month video surveillance recordings if defendant supplied blank hard drives onto

which the videos could be copied, or to produce the video for inspection by defense counsel at

---

[1]        The August 8, 2008 letter does not specify the amount of video or dates of the video produced on
DVD on that date.

either Agent Chironno's office or defense counsel's office. (Def. Mem. at 3-4, Ex. B; Gov't Opp. at 3.) In a letter from the government to defense counsel dated November 13, 2008, the government noted that defense counsel had not responded to its previous offers regarding the viewing and/or production of four months of covert surveillance video. (Def. Mem., Ex. B.) The government's November 13, 2008 letter also noted that it had already produced clips from the video footage on DVD, and stated that "[i]f the government decides to use any additional video clips at trial that have not already been produced, we will turn over those video clips at our earliest opportunity." (*Id.*) According to the defendant, the government represented that "Agent Chironno viewed all four months of video and did not find any material that would be exculpatory or otherwise helpful to the defense[.]" (*Id.*)

Defense counsel responded in an undated letter, indicating that on September 26, 2008, he had informed the government that review of the entire video in the office of either Agent Chironno or defense counsel "would be impractical" due to "the amount of video surveillance." (Def. Mem., Ex. C at 3.) Defense counsel's letter also stated that he had noted that the surveillance video should be produced in a format that would not require him to purchase special software in order to view the video, "and that is how we left the matter" as of September 26, 2008. (*Id.*) Defense counsel's undated letter asked the government to "contact me as soon as possible so that I may provide you with whatever duplication device you need to make a copy of the remaining surveillance video." (*Id.*)

On November 18, 2008, counsel conferred regarding production of the entire video surveillance recording. Defense counsel agreed to supply hardware onto which the government could copy the video, and the government indicated that copying would take approximately two weeks, so defense counsel "might just have the weekend before trial to

review it." (Tr. 678-79, 950.)[2]  Defense counsel stated that "he could live with that" and would be satisfied if the entire video was produced by December 5, 2008, the Friday before trial, so that he could "do his due diligence even if he ha[d] to fast forward through most of it."  (Tr. 949-50: the government read from its contemporaneous notes of counsels' conversations, the substance of which the defendant did not dispute.)  On November 20, 2008, the government re-produced the video clips it had previously produced, along with two new ones.  (Gov't Opp. at 5; Def. Mem., Ex. D.)  The entire four months of surveillance video was thereafter produced to defense counsel by December 3, 2008.  (Def. Mem. at 4-5, Ex. G.)  In a letter to defense counsel dated December 6, 2008, the government stated, "The production of this [second] hard drive completed the government's production of all of the covert surveillance video relating to the defendant and, per our conversations, satisfied the defense's request to receive this evidence by December 5, 2008."  *Id.*  Defense counsel did not seek any adjournment of the December 8, 2008 trial date.

## B.  The Drawer Count Video Clip

In the entire four months of video surveillance produced to defense counsel on December 3, 2008, there are two instances depicted on video of a supervisor conducting a "cash drawer count" to determine how much money was in defendant's drawer.  (Gov't Opp. at 5.)  In the week before trial, the government reviewed the video recordings of these two cash drawer counts, one of which occurred on June 2, 2006.  (*Id.*)  The government describes the June 2, 2006 video, which the court has never seen, as follows:  "In the video of the June 2, 2006 count, the defendant's supervisor approaches the defendant with a clipboard, and then walks away. The defendant then begins preparing for a cash drawer count. While counting her drawer, the defendant takes a bundle of cash from her drawer and gives it to another window clerk. This

---

[2]        "Tr." refers to the official trial transcript.

second window clerk then gives the defendant a single bill, which the defendant includes in the money being advanced or counted. The supervisor then returns and completes the cash drawer count. After the drawer is counted, the second window clerk gives the bundle of cash back to the defendant. The defendant is not seen passing any cash back to the second window clerk." (*Id.* at 5-6, citing Tr. 693-97.)  Defense counsel does not dispute this description of the June 2, 2006 Drawer Count video.  (Tr. 712-14; Def. Mem. at 13.)

Counsel for the government states that she first became aware of the June 2, 2006 Drawer Count video segment just prior to trial, on December 4, 2008, when Agent Chironno pointed it out to counsel and counsel made a copy of the clip on her computer (the "Drawer Count Clip")  (Tr. 953-54).  The government concedes that it was aware of the Drawer Count Clip when it produced its trial exhibits on December 5, 2008, but states that it did not include the Drawer Count Clip among those produced to the defense because "as of that date the government had no explanation for the conduct in the video" and therefore "did not intend to use the video in its case-in-chief."  (Gov't Opp. at 6.)[3]

## C.    Trial

### 1.    *Opening statements*

In its opening statement, the government stated that the evidence would show that the defendant put unrecorded money in her drawer while working as a postal teller, making it possible for her to take that money later.  (Tr. 82.)  The government did not discuss defendant hiding money from her supervisor.  (Tr. 79-84.)  One of the themes of the defendant's opening statement was the fact that, despite "over 60,000 minutes" of video surveillance, "not one of

---

[3]    The court finds that Agent Chironno's redirect testimony regarding the Drawer Count Clip was part of the government's case-in-chief.  Black's Law Dictionary defines case-in-chief as follows:  "1.  The evidence presented at trial by a party between the time the party calls the first witness and the time the party rests.  2.  The part of a trial in which a party presents evidence to support the claim or defense."  *Black's Law Dictionary* (8th ed. 2004).

those minutes shows [defendant] putting any money in her pocket, any money in her [p]urse or anywhere else on her person." (Tr. 85.) Defense counsel asserts that this defense theme was based on conversations with government counsel and the case agent, "in which they confirmed that there were no video clips of Kaur taking any money." (Def. Mem. at 6.)

### 2. *Agent Chironno's testimony*

#### a. Direct testimony

On December 10, 2008 and continuing into December 11, 2008, the government conducted its direct examinations of Agent Chironno. At no point during Agent Chironno's direct testimony was any testimony about the June 2, 2006 Drawer Count video clip elicited. However, the government states that "[a]t the end of the first day [of Agent Chironno's testimony], the government reexamined the June 2, 2006 video and came to believe that it might be showing the defendant hiding money from her supervisor before that day's cash drawer count." (Gov't Opp. at 7.) The government nonetheless states that it "still did not intend to use the video in its case-in-chief" and therefore did not produce a clip of the June 2, 2006 video to the defense "as a potential trial exhibit." (*Id.* at 7-8.) The government concluded Agent Chironno's direct examination without eliciting any information about the June 2, 2006 video. (*Id.*)

#### b. Cross-examination

The defendant cross-examined Agent Chironno on December 11, 2008, repeatedly focusing on the fact that Agent Chironno, in reviewing the four months of video surveillance footage of the defendant, did not see any instance of defendant putting money in her pocket, her purse, or her personal things, and that Agent Chironno did not find any witnesses who saw defendant "pocket any money." (Def. Mem. at 8-9, citing Tr. 623, 688.) During cross-

examination of Agent Chironno, defense counsel addressed the periodic cash drawer counts performed by defendant's supervisors, asking "if [defendant] intentionally made errors, the type of errors that you said she made, and she failed to correct them, you expect that she would have an overage during – at least in one of these credit checks while her supervisor was right there, wouldn't you?" (Tr. 599.) Agent Chironno replied in the affirmative, and defense counsel then asked, "unless she was able to take the extra money out of the drawer and either hide it or put it in her pocket with her supervisor standing right there, she should have an overage during one of these credit checks, shouldn't she?" (*Id.*) Agent Chironno responded, "If her supervisor was there, yeah," and, under further questioning, admitted that defendant never had an overage in her drawer during the credit checks. (Tr. 599-600.)

During Agent Chironno's cross examination, the court broke for lunch. After the lunch break and before the jury returned to the courtroom, counsel conferred with the court. Defense counsel began by stating, "Initially, I just want to say . . . that this is . . . on me. I bear a fair share of responsibility here, but AUSA Orenstein gave me two hard drives representing the entire . . . [four months] of video . . . on two hard drives . . . about ten days ago." (Tr. 669:8-16.) Defense counsel continued that, "I am embarrassed to say that I just started looking at it . . . last night and I . . . realized it wasn't playing on my computer," because he needed to install software in order to view the video. The parties then discussed whether Agent Chironno could be recalled for cross examination by the defense after the defense case was completed, and ultimately the parties agreed that Agent Chironno could be recalled before the defense case. (Tr. 669-681.) Defense counsel then concluded cross examining Agent Chironno.

c.     Redirect and re-cross examination

On redirect examination of Agent Chironno, without any objection to the line of questioning by defense counsel, the government elicited testimony about the Drawer Count Clip, as follows:

Q:     Mr. Bier asked you questions many times about whether you ever saw the defendant pocket money. Did you see her put it in her pocket?

A:     I did not see her.

Q:     Did you ever see her hide it before a drawer count?

A:     Yes, I have.

Q:     Are you sure?

A:     Pretty sure.

Q:     Not entirely sure?

A:     The money was handed off to another clerk, but ultimately came back.

Q:     Why don't you describe what you saw and when you saw it, if you ever witnessed the drawer count?

A:     It was a June drawer count. Ms. Gibney came into the picture here to say, I'm counting your drawer. She had that clipboard. Walked off the picture. Then you see a cash advance being prepared, counting out the money. A bundle of ones counted, rubberbanded –

Q:     How do you know this is bundled ones?

A:     It appeared, based on I'm looking at the bill, I can see Andrew Jackson. I saw the one.

Q:     Okay.

A:     The ones were taken, they were taken placed on the left-hand of the big parcel window. She continued to finish her drawer. The clerk next to her would then hand the bundle

of money. Her drawer popped open. She threw it in on her right side of the drawer, where the ones – not the ones, the coils of change, rolls, were, dropped it in.

Q:    Hold on just a moment. Do you have a video of that clerk's window.

A:    Yes, I do.

Q:    Were you able to see, from that camera angle, what was happening?

A:    Yes.

. . . .

A:    She came back. She had the drawer count, got the drawer, off camera again, came back with Ms. Gibney, and you could see Ms. Gibney with the clipboard entering the denomination received, and it actually shows, partially on the screen, that she was committing the $100 drawer count. Afterwards, Ms. Kaur came back to the window, performed the transaction. The clerk from her right walks over and gives back the cash.

Q:    Did the clerk from the right – from the other window ever give her anything in exchange for the bundle of bills?

A:    There was one bill provided to her.

Q:    What happened with that bill?

A:    It was placed on the desktop, and it looks like it got scooped up with the cash from one of the two counts.

Q:    Did you see any money going back to that clerk on the other window when that clerk gave the bundle back?

A:    No, I did not.

. . .

Q:    How much money, beyond the $100 that should be in the cash drawer, did Ms. Kaur have on that day when her cash drawer was counted?

A:        Approximately seventy-eight.

Q:        And just to clarify the question: Assuming that she had only put in extra money and never taken any money out, how much extra money beyond $100 would be in that drawer?

A:        77.82.

Q:        If that money stayed in her drawer, would the cash drawer count have had an overage, be in tolerance or be short?

A:        It should have been over by roughly that amount.

Q:        If that bundle had been a bundle of 100 single bills that she took out of her drawer, and if the bill that was given to her by the other clerk was a 20 and she turned that money in to be counted, would she have been in tolerance?

A:        Yes.

Q:        Can you be sure that's what happened in that video?

A:        Not exactly. But they shouldn't be swapping money back and forth like that.

(Tr. 692-97.)

Although Agent Chironno described the Drawer Count Clip in his redirect testimony, the government did not show the video to the jury or offer it into evidence at that time. Except to the form of one question by the government, defendant did not object to Agent Chironno's redirect testimony regarding the Drawer Count Clip (Tr. 695),[4] and touched only briefly on the topic of the Drawer Count Clip during Agent Chironno's re-cross examination. (Tr. 706-09.)

---

[4]      During oral argument on April 22, 2009, defense counsel stated that the reason he did not object to Agent Chironno's redirect testimony regarding the June 2, 2006 video was that he did not realize at the time of Agent Chironno's testimony that the June 2, 2006 video clip was not among those previously produced as potential trial exhibits.

### 3. Sidebar following Agent Chironno's re-cross testimony

Following Agent Chironno's re-cross testimony, the government requested a sidebar, at which counsel for the government requested to offer the Drawer Count Clip into evidence:

> The video discussed on my first redirect is something that Agent Chironno showed me in the last week. We've been trying to hash out what it is. . . . I didn't want to use it on my direct case because I felt it wasn't as strong as the evidence I have but I put it in on redirect because there was enough cross about money being taken, money falling behind, that I felt it was appropriate to talk through it with the agent. . . . I have the video on my computer, did not turn it over previously because I did not anticipate it was an exhibit. I want to show it at this point . . . so [the jury] could evaluate it for themselves. It's not a smoking gun. It's a weird transaction that could be interpreted one way or the other.

(Tr. 712.) Defense counsel responded that it was "very disturbing she didn't turn over this video . . . I've never been told by the government or by Agent Chironno of this instances [sic]. Then I get sandbagged by it. I think it's a very serious matter. It's the one instance where the government is saying there's something on camera that she did that is involved in stealing. Otherwise there's no other instance." (Tr. 712-13.) A recess was taken to allow defense counsel to view the Drawer Count Clip outside the presence of the jury, after which the government informed the court it would not offer the Drawer Count Clip into evidence. The government stated that the defense counsel's computer problems had been worked out, that it would give the defendant a copy of the Drawer Count Clip to review that night, and that defense counsel would have the opportunity to recall Agent Chironno about the video, and then discuss whether the Drawer Count Clip video would be admitted. (Tr. 713-14.)

### *4.      Discussion on December 12, 2008 regarding the Drawer Count Clip*

The next day, December 12, 2008, defense counsel returned to the issue of the Drawer Count Clip, stating, "I'd really like to ask the court permission to reserve the motion for after the verdict is returned, but I would ask for a motion of dismissal based on the prosecutor presenting evidence of a transaction on the videotape which, in the first three videos, I never received, and apparently, it's on a, what's essentially a document dump, on December 4th; and it was among maybe a thousand hours of worth of [sic] video." (Tr. 945.) The court asked defense counsel whether there was "any way that we could give an instruction or a direction to the jury that would obviate [the defendant's] concerns at this stage before they deliberate rather than wait until after they reach a verdict." Defense counsel responded that ". . . I feel the bell has already rung and they've heard it and mentioning it would just bring it further to their attention. We've seen no video, the jury has seen no videotape of it." (Tr. 945.)

Regarding the production of the video to the defendant in discovery, the court noted that the defense received the Drawer Count Clip in the complete video surveillance on December 3, 2008, and noted that the defense never requested an adjournment of the trial. (Tr. 948-49.) The government argued that, although the Drawer Count Clip was produced within the entire surveillance video and not as a separate clip, defense counsel "didn't even bother to open the hard drive until Thursday, [December 11, 2008], in the middle of the trial, that started on Monday, [December 8, 2008]" and that "to say that there should be a mistrial because he didn't see something that is something that one would look for, a cash drawer count, there is [sic] only two in the video time period and we have the dates for both of them . . . just doesn't add up to me." (Tr. 951.) Asked to articulate what prejudice was caused by Agent Chironno's testimony about the Drawer Count Clip, defense counsel stated, "if I knew it was part of the government's

case, I wouldn't have made an argument that in 60,000 minutes, there is not one instance where she's shown taking money." (Tr. 955.) The government contended that defendant's argument remained true, because the Drawer Count Clip showed "shenanigans" and "hiding of money before a cash drawer count," but did not show the defendant actually taking any money. (Tr. 955-56.)

As to remedies, including striking the testimony about the Drawer Count Clip and instructing the jury to disregard it, defense counsel contended that "the bell has already rung," *id.* at 945, and the court suggested that the jury be instructed to "disregard the testimony of Agent Chironno [regarding the Drawer Count Clip] and they should not consider that testimony at all." Tr. 956-57. The government on three occasions requested that the testimony be stricken as the "safest way to go for all parties," and indicated that the "evidence has not been an important part of the government's case." (Tr. 961-62, 964.) Defendant repeatedly opposed striking the testimony. (Tr. 956-69.) Defense counsel stated that "I'm saying to the court that I will withdraw any motion for a mistrial. If I have an opportunity to put the government to the test and [argue to the jury] why weren't you shown this video that purports to be the one instance where [the defendant] committed some impropriety. I think that's the only way this can be cured. I think that curative instruction [to strike the testimony] just hammers it home." (Tr. 963.) The court again discussed striking the portions of Agent Chironno's testimony that the defense found objectionable, as follows, "[i]f I instruct the jury, 'Do not consider that testimony,' why . . . wouldn't [that] fix it because we've done that previously in a trial about other testimony and they've taken an oath to follow my instructions. And if I instruct them, 'Do not consider this testimony,' they shouldn't consider it." (Tr. 968.) Defense counsel argued that "this is a much more serious matter than the other curative instructions . . . [b]ecause it goes to the very heart of

our defense that we said that there's not one incident showing that a video [sic] of her doing anything improper or taking money and [the government] put it in redirect that there was." (Tr. 969.) The court ultimately granted the defendant's proposal, stating, "[m]y ruling is that [defense counsel] will be allowed to argue to the jury that this videotape wasn't shown." (Tr. 972, 977.) On that basis, defense counsel withdrew his motion for a mistrial and stated he was ready to proceed with closing arguments. (Tr. 972.)

### 5. *Summations*

The government, summing up first, mentioned the Drawer Count Clip, noting that Agent Chironno was "not really sure" what the video showed, and arguing that, although the video was "strange and confusing," there appeared to be some "shenanigans" going on during the cash drawer count. (Tr. 1020-21.) The government pointed out that it had not shown the Drawer Count Clip to the jury as evidence. (Tr. 1020.)

Defendant objected and, at sidebar, argued that the government had violated the court's remedy by discussing the Drawer Count Clip before defense counsel had an opportunity to argue to the jury that the government had not presented it as evidence. (Tr. 1022-23.) The court expressed surprise that the government had not indicated in advance that it would discuss the Drawer Count Clip in its summation, and the government explained that it was not planned, but rather "just a natural progression from what I was saying[.]" (Tr. 1026.) The government argued that, because it summed up first, and because Agent Chironno's testimony about the video was in the record, it would be unfair to prevent the government from commenting on that testimony in its summation. (Tr. 1023-1026.) The court noted that its ruling had never barred the government from mentioning the testimony about the Drawer Count Clip in its summation, and emphasized that defendant had been "vehemently opposed" the option of striking the

testimony about the Drawer Count Clip, so there was no reason the government could not mention it.  (Tr. 1028-29.)  The parties then agreed upon and the court included an instruction to the jury that videos described in testimony but not entered into evidence could not be considered as evidence.  (Tr. 1031-32.)

### 6. *Defendant's renewed motion for a mistrial*

On December 15, 2008, despite withdrawing her motion for a mistrial after the court granted defendant's requested remedy regarding the Drawer Count Clip, defendant renewed her motion for a mistrial, arguing that "the government violated the rules under 16(a)(1)(E) in that we weren't on notice as to the exhibits the government was going to use in its case in chief and that we had no opportunity to prepare our defense based on this video exhibit that was referred to in Agent Chironno's redirect."  (Tr. 1091.)  Defense counsel stated that "I realize the government's actions [in referring to the Drawer Count Clip in its summation] didn't violate the letter of the court's order but certainly violated its spirit."  (*Id.*)  The court then granted the defendant leave to make a post-trial motion on the issue.  (Tr. 1099.)

## II.  DISCUSSION

### A.  Motion for a New Trial Pursuant to Rule 33

A court may grant a new trial "if the interest of justice so requires." Fed. R. Cr. P. 33(a).  However, this requires a finding that allowing the jury's verdict to stand would constitute a  "manifest injustice," *United States v. Ferguson,* 246 F.3d 129, 133-34 (2d Cir. 2001), and would create a real concern that an innocent person had been convicted, *United States v. Guang,* 511 F.3d 110, 119 (2d Cir. 2007).  Defendant contends that the manifest injustice she suffered was the government's violation of its Fed. R. Crim. P. 16(a)(1)(E) discovery obligations, resulting from the government's failure to identify and turn over the Drawer Count Clip about

which Agent Chironno testified on his redirect examination.  In particular, defendant alleges that the government violated the subsection of Rule 16 that requires, in relevant part:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
> (i) the item is material to preparing the defense;
> (ii) the government intends to use the item in its case-in-chief at trial[.]

Fed. R. Crim. P. 16(a)(1)(E).

The parties do not dispute that defendant requested and received discovery of the entire 800-1,000 hours of video surveillance of defendant on December 3, 2008, two days earlier than the mutually agreed upon deadline for production of the entire video.  Rather, defendant contends that the government "used" the Drawer Count Clip in its case-in-chief by eliciting testimony about the clip during Agent Chironno's redirect, even though it was never introduced into evidence.  Defendant also asserts that because the government did not specifically identify and isolate that clip from the 1,000 hours of surveillance, the government failed to disclose the evidence within the meaning of Rule 16(a)(1)(E).  The defendant further contends that the government's failure to disclose the Drawer Count Clip was intentional or at least done with knowledge that the Drawer Count Clip had significant value to the defense; and that the Drawer Count Clip was material to the defense because the failure to disclose it led defense counsel to pursue a defense theory that was undercut by the agent's testimony regarding the Drawer Count Clip.

### 1.    The "failure to disclose" argument

Notwithstanding the government's production of all surveillance video to defense counsel two days prior to the agreed upon date, the government did not take any affirmative

action to segregate or specifically identify the Drawer Count Clip in any way prior to Agent Chironno's testimony or redirect. Defendant argues that the disclosure of the entire surveillance video without specific identification of the Drawer Count Clip did not constitute adequate disclosure because the Drawer Count Clip was "bound within voluminous amounts of other material produced just in advance of trial." (Def. Mem. at 30.)

In support of her position, defendant cites *United States v. Gil,* 297 F.3d 93 (2d Cir. 2002), in which the Second Circuit found insufficient disclosure where the government include a two-page memorandum containing *Brady* material "among five reams of paper labeled '3500 material,' delivered sometime on the Friday before a Monday trial, at a time presumably when a conscientious defense lawyer would be preoccupied working on an opening statement and witness cross-examinations and all else," because under such conditions, "the defense was not in a position to read [the memo], identify its usefulness, and use it." *Id.* at 106. The *Gil* case is distinguishable from the instant case. First, the Drawer Count Clip, as described in Agent Chironno's testimony and by counsel for the parties, is not *Brady* material. The memo in *Gil* contained exculpatory *Brady* material which corroborated the testimony of the defendant's witnesses and tended to impeach the government's witnesses on the central issue relevant to guilt. *Id.* at 102. Here, based on the description by the parties, the Drawer Count Clip contained material that had only the potential to *inculpate* defendant, and did not contain material with which defendant could impeach the government's witnesses. The government therefore had no obligation under *Brady* or Rule 16 to separately identify and produce the Drawer Count Clip. *See United States v. Douglas,* 525 F.3d 225, 244-45 (2d Cir. 2008) (stating that, to comprise a

*Brady* violation, the evidence at issue, *inter alia*, "must be favorable to the accused, either because it is exculpatory, or because it is impeaching[.]") (quotation omitted).[5]

Second, the defendant here entered into an agreement with the government to receive Rule 16 disclosure of the complete surveillance video just before trial and did not attempt to view that video until near the end of the first week of the trial, whereas the defendant in *Gil* had been assiduously requesting material like the memorandum at issue for "more than ten months before trial" and had indicated the defense theory to which those documents related. 297 F.3d at 105. In *Gil,* when the government indicated that it had produced all of the requested discovery without producing the sought-after documents, the defendant told the court that he had a good faith belief that requested documents existed and asked the court to order the government to turn over any relevant materials. *Id.*[6] Without identifying the memorandum or indicating that it was responsive to the repeated defense requests, the government eventually produced the memorandum on the Friday before a Monday trial, amongst 2,700 pages of other documents. *Id.* at 106. In contrast, the government here had offered, by September 26, 2008, to make the entire four months of surveillance video available to the defendant. The defendant insisted on production in a particular manner, and did not follow up on that request with the government for almost a month, until mid-November 2008. (Def. Mem., Ex. C at 3.) On November 18, 2008, defense counsel agreed to receive the entire surveillance video by December 5, 2008, the Friday before trial, so that he could "do his due diligence even if he ha[d] to fast forward through most of it." (Tr. 949-50; the government reading from its contemporaneous notes of counsels'

---

[5]     *Leka v. Portuondo,* 257 F.3d 89 (2d Cir. 2001), the other case cited by defendant regarding the "disclosure of critical information on the eve of trial," Def. Mem. at 30-31, also involved the suppression of exculpatory *Brady* material, not inculpatory Rule 16 discovery.

[6]     *Gil* does not indicate how the trial court ruled on this motion. 297 F.3d at 105-06.

conversations.)  The government produced the video two days ahead of the agreed schedule, and defendant did not even attempt to view the video until December 11, 2008, in the middle of the trial.  (Tr. 951.)  Therefore, unlike the situation in *Gil*, the defendant here agreed to receive the documents at the time and in the manner they were produced and admittedly did not start conducting the "due diligence" for which the entire surveillance video was requested until December 11, 2008.

The Drawer Count Clip does not constitute *Brady* material, and was produced by the government within the entire surveillance video according to a schedule to which the defendant agreed.  Consequently, *Gil* does not compel granting defendant's motion.  The court therefore finds that the government timely and adequately produced the Drawer Count Clip under Fed. R. Crim. P. 16(a)(1)(E) and need not reach defendant's argument that the government's nondisclosure was intentional.

### 2.    *The materiality of the Drawer Count Clip to the defense*

Under Fed. R. Crim. P. 16(a)(1)(E)(i), the government is only required to disclose material to the defendant if "the item is material to preparing the defense."  Contrary to defendant's contention, the Drawer Count Clip was not material to the preparation of the defense.  Materiality of evidence to the defendant "is measured by the effect of its suppression upon preparation for trial."  *United Stated v. Kahn,* 472 F.2d 272, 287 (2d Cir.), *cert. denied,* 411 U.S. 982 (1973).  The defendant bears the burden of demonstrating materiality, for "it is incumbent on a defendant to make a *prima facie* showing of 'materiality'[.]"  *United States v. Maniktala,* 934 F.2d 25, 28 (2d Cir. 1991) (*quoting United States v. Buckley,* 586 F.2d 498, 506 (5th Cir. 1978), *cert. denied,* 440 U.S. 982 (1979)).  "Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case. There must

be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." *Id.* (*quoting United States v. Ross,* 511 F.2d 757, 762-63 (5th Cir.) (citations omitted), *cert. denied,* 423 U.S. 836 (1975)).

Here, the Drawer Count Clip would not have altered the quantum of proof in defendant's favor because it was *inculpatory* rather than exculpatory. *See id.* (finding immaterial inculpatory evidence that "overwhelmingly mirror[ed] the government's other proof"). Defense counsel seemingly argues that the Drawer Count Clip was material to preparing a theory of defense that could counter the Drawer Count Clip's inculpatory impact, and that defendant suffered "prejudice" when Agent Chironno described the clip on redirect. Notwithstanding that neither the defense nor the government assert that the Drawer Count Clip shows the defendant taking money, defense counsel contends, "if I knew [the Drawer Count Clip] was part of the government's case, I wouldn't have made an argument that in 60,000 minutes, there is not one instance where she's shown taking money." (Tr. 955.)

Defendant's memorandum of law offers no authority for the proposition that evidence is material pursuant to Fed. R. Crim. P. 16(a)(1)(E)(i) simply because it would have led the defendant to choose a different theory of defense to pursue in opening statements, on cross-examination, and in summation. Rather, *United States v. Stevens,* 985 F.2d 1175, 1180 (2d Cir. 1993) supports a contrary conclusion in noting that evidence is not material to the defense simply because it "would have dissuaded the defendant from proffering easily impeached testimony." Instead, evidence "is material if it could be used to counter the government's case or to bolster a defense," not "merely because the government may be able to use it to rebut a defense position" or "because it would have dissuaded the defendant from proffering easily impeached testimony." *Id.* Thus, *Stevens* and *Maniktala, supra,* indicate that materiality arises

from the positive *evidentiary* value to the defense of the material to be disclosed, not its value in discouraging a defendant from articulating an argument or *theory* of defense. *See Stevens,* 985 F.2d at 1180; *Maniktala,* 934 F.2d at 28-29.

The court finds that the Drawer Count Clip was not material to preparing the defense because it was not exculpatory and could not have "enabled the defendant to significantly alter the quantum of proof" in her favor. *Maniktala,* 934 F.2d at 28. Thus, the government's disclosure of the Drawer Count Clip in the factual circumstances presented did not violate Fed. R. Crim. P. 16(a).

### 3.     *Waiver of prejudice claim*

The defendant waived any claim of prejudice resulting from Agent Chironno's testimony about the Drawer Count Clip when defendant failed to object to the testimony, and then rejected the court's offer to strike Agent Chironno's testimony about the clip, instead insisting on her own alternative remedy, ultimately adopted by the court. Even though the government did not violate Rule 16(a), the court notes that if there were such a violation, the court has "broad discretion in fashioning a remedy for the government's violation of its obligations under Rule 16(a), including ordering the exclusion of evidence." *United States v. Salameh,* 152 F.3d 88, 130 (2d Cir. 1998) (*citing United States v. Thai,* 29 F.3d 785, 804 (2d Cir.), *cert. denied,* 513 U.S. 977 and 513 U.S. 993 (1994)). Furthermore, "a district court's decision not to exclude evidence that was the subject of a Rule 16(a) violation is not grounds for reversal unless the violation caused the defendant substantial prejudice." *Id.* (quotations omitted). Here, even though the court did not find that the government violated Rule 16(a), the court repeatedly offered to strike Agent Chironno's testimony and provide an instruction to the jury but, because of the defendant's strong objection to that remedy, the court granted

defendant's request that during closing argument, defendant be permitted to argue that the government never showed the Drawer Count Clip. Moreover, defendant explicitly agreed to withdraw her motion for a mistrial before and after the court granted her proposed remedy. It cannot be said that the court's decision not to strike Agent Chironno's testimony, to which defendant did not object, caused substantial prejudice to the defendant, because the defendant argued *against* exclusion of the evidence. Indeed, as in *Thai*, the defendant, after moving for a mistrial, was offered "the most severe remedy a court can impose short of declaring a mistrial," that of striking testimony from the record. *Thai,* 29 F.3d at 806. The Second Circuit stated in *Thai* that "[n]o more was required" of the district court, *id.*, and affirmed the conviction, *id* at 820-21. In *Thai*, the defendant rejected the court's offer to strike the evidence and was allowed by the court to pursue a different strategy. Here, the defendant withdrew her motion for a mistrial when the court granted the remedy she sought.

As established by the record, *supra,* the court repeatedly offered to strike Agent Chironno's testimony regarding the Drawer Count Clip (Tr. 945, 957)—offers that the defendant "vehemently opposed." (Tr. 1029.) Instead, the court adopted the remedy proposed by defendant—that defendant be allowed to argue to the jury in summation that the government had described the Drawer Count Clip through Agent Chironno's testimony, but had failed to enter the clip into evidence or show it to the jury—and defendant withdrew her motion for a mistrial. Defendant therefore waived any claim that she suffered substantial prejudice under Fed. R. Crim. P. 16(a) due to Agent Chironno's testimony remaining in the record.

### 4. *Rule 16 violations as a grounds for Rule 33 relief*

For the foregoing reasons, the interests of justice do not require that defendant be granted a new trial under Rule 33 based on the government's alleged violations of Rule 16(a),

because allowing the verdict to stand would not constitute a "manifest injustice." *Ferguson,* 246 F.3d at 133-34. Even if the government had violated Rule 16(a), manifest injustice would not exist because the record does not raise the concern that an innocent woman has been convicted. *See Guang,* 511 F.3d at 119. In this case, as discussed above, the alleged Rule 16(a) violations involved testimony about a video clip that was inculpatory in nature, rather than exculpatory. This is not a case where the alleged Rule 16(a) violation (which the court has found not to have occurred) left defendant unable to attack crucial evidence against her, or without access to evidence of innocence. Instead, the material that the government allegedly failed to adequately disclose was consistent with, but not as strong as, the other overwhelming evidence of defendant's guilt. Given the lack of merit in defendant's arguments under Rule 16(a), the court finds that allowing the jury's verdict to stand would not constitute a manifest injustice, and therefore denies defendant's motion for a new trial pursuant to Rule 33.

### B.  Motion for Acquittal Pursuant to Rule 29

In order to grant a motion for a judgment of acquittal, the court must find that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt because the evidence against the defendant was nonexistent or meager. *United States v. Jackson,* 335 F.3d 170, 180 (2d Cir. 2003). The court must view the evidence in the light most favorable to the government. *United States v. Aleskerova,* 300 F.3d 286, 292 (2d Cir. 2002).

In this case, the jury verdict was fully supported by the overwhelming evidence of defendant's guilt offered by the government. The government introduced into evidence video clips which showed the defendant selling over $1,000 worth of postal products to customers, but failing to account for, failing to enter, or falsely entering those sales into the postal computer system. In the video clips, the defendant can be seen placing cash obtained during these sales

into her cash drawer.  The government introduced documentary and testimonial evidence

establishing that defendant was aware of her duties as a postal employee, that despite the more

than $1,000 in unaccounted-for cash seen going into the defendant's cash drawer in the videos,

defendant's drawer never contained extra cash when it was counted or checked by supervisors,

and that the defendant never turned over any cash above that falsely recorded as having been

received in the computer system.  This evidence was more than sufficient for a reasonable jury to

conclude beyond a reasonable doubt that the defendant embezzled over $1,000 that came into her

control through her position with the Postal Service by failing to turn over or account for the

funds, and that the defendant made false records in the Postal Service computer system despite

her knowledge of her duty to keep proper records.  The court finds that the jury had a sufficient

basis to convict defendant of violating 18 U.S.C. §§ 1711 and 2073, and thus denies defendant's

motion for a judgment of acquittal pursuant to Rule 29.

### III.  CONCLUSION

The court finds that the government did not violate Fed. R. Crim. P. 16(a)(1)(E)

by failing to provide defendant with a copy of the Drawer Count Clip separate from the entire

surveillance video, or by eliciting testimony about that clip from Agent Chironno on redirect

examination.  The court also finds that allowing the jury's verdict to stand would not create

manifest injustice or the risk that an innocent woman was convicted, and finds that there was

sufficient evidence in the record for the jury to convict defendant of violating 18 U.S.C. §§ 1711

and 2073.  The defendant's Rule 29 and Rule 33 motions are therefore denied in all respects.

The court schedules defendant's sentencing as follows.  With respect to the

presentence report, the parties need not file the following submissions by ECF but should direct

their responses to the Probation Department and provide a courtesy copy to the court:

Defendant's objections to the Presentence Report are due by July 1, 2009, the government's response is due by July 10, 2009, and the defendant's reply is due by July 14, 2009. The parties shall simultaneously submit any sentencing memoranda to the court by ECF with a courtesy copy to chambers by July 22, 2009, and any responses shall be submitted in the same manner by July 27, 2009. Sentencing will be held before the undersigned on July 31, 2009 at 2:30 p.m.

**SO ORDERED**

Dated: Brooklyn, New York
        May 7, 2009

                        ___/s/_____
                        **KIYO A. MATSUMOTO**
                        United States District Judge